OLGA N. FRYE, *et al.*

*v.*

WILBERT H. NORTON, *Etc.*

(No. 12251)

Submitted January 21, 1964.        Decided April 7, 1964.

*Campbell, McNeer, Woods, Bagley & Emerson, L. E. Woods, C. F. Bagley,* for appellant.

*Daugherty & Daugherty, Duncan W. Daugherty, Joseph A. Keating,* Falls Church, Va., for appellees.

CAPLAN, JUDGE:

This action was instituted on November 3, 1961, by Olga N. Frye in the Circuit Court of Cabell County against Wilbert H. Norton, individually, and in his capacity as executor under the purported last will of Mabel Beatrice Tarrer, wherein the plaintiff prayed that an issue devisavit vel non be made up and presented to a jury to determine whether a certain writing which had been admitted to probate was or was not the true last will and testament of Mabel Beatrice Tarrer. Thereafter, at a pretrial conference, certain other persons, presumably relatives of the deceased, were added as parties plaintiff.

On June 6, 1961, Mabel Beatrice Tarrer, hereinafter sometimes called Mabel Tarrer, died. On June 15, 1961, the defendant, Wilbert H. Norton, filed in the County Court of Cabell County a writing purporting to be the last will and testament of Mabel Tarrer. All of her heirs at law and distributees who were residents of this state were served with proper notice of this proceeding, and all of the heirs at law and distributees who were nonresidents were served with notice thereof by a proper order of publication.

At the hearing of this matter on August 10, 1961, the aforesaid writing was offered for probate in solemn form. Thereupon, the County Court of Cabell County entered its order admitting this writing to probate as the last will and testament of Mabel Tarrer. Under the provisions thereof Mabel Tarrer devised and bequeathed all her property to Wilbert H. Norton. This action was instituted to impeach that will.

Mabel Tarrer and her husband Tom Tarrer had been residents of Huntington for many years. Throughout this period of time Mr. Tarrer had operated a restaurant in that city and had acquired considerable property, both business and residential. For many years prior to his death, which occurred in 1952, the defendant, Wilbert H. Norton, an attorney, had represented and advised him in all legal matters pertaining to his business and properties. Upon Mr. Tarrer's death, the defendant assisted

Mabel Tarrer, executrix of her husband's estate, in the settlement of such estate. Mr. Tarrer had left substantially all his property to his widow. Mr. Norton continued to represent and advise Mrs. Tarrer in her business affairs.

The testimony in the record discloses that Mabel Tarrer, then past seventy five years of age, expressed a desire to make a will and, on several occasions, discussed this matter with the defendant. Having indicated to Mr. Norton that she wanted to leave her property to him, he advised her that he could not write the will and told her to consider the matter further. She brought the matter up again and he recommended that such will be prepared by other counsel.

As a consequence the defendant contacted J. W. St. Clair, who was then President of the Cabell County Bar Association, and McDaniel Purcell, a former president of said association, and asked them if they would confer with Mrs. Tarrer for the purpose of writing her will. They agreed and on or about February 10, 1954, Mr. Norton took the two lawyers to the home of Mabel Tarrer. After introducing them to Mrs. Tarrer, the defendant retired to another room in the house and was not present during the conference between the lawyers and Mabel Tarrer.

Mr. St. Clair had passed away prior to the trial of this case, and Mr. Purcell was the only witness to testify as to the drafting and execution of the will in quesiton. According to his testimony, he and Mr. St. Clair talked at length with Mabel Tarrer on the occasion of their first visit. They asked her if she wanted to make a will and, upon receiving an affirmative reply, explained the function and meaning of a will and the manner in which her property would be distributed in the absence thereof. They also advised her that she could revoke or change her will at any time.

The following questions were propounded to and answers adduced from Mr. Purcell: "Q. In your opinion did she understand what you were telling her at that time? A. Oh, yes, she knew perfectly well what a will was. Q.

Did she at that time advise you as to whether or not she wanted to make a will? A. Yes. She said she wanted to make a will, and we asked if she wanted us to do the work for her or would prefer to have someone else. She said we were friends of Mr. Norton and that would be all right with her. Q. Did she tell you how she wanted you to prepare the will, in what way the property was to be disposed of? A. Yes, she told us. Q. What did she tell you? A. We asked her who she wanted to leave her property to and she said she wanted to leave it to Mr. Norton. Q. Did she give any explanation why she wanted to leave it to him? A. Yes, we immediately asked her why. And she said that before her husband's death they had discussed the ultimate disposition of the property they had and she had expressed to her husband, Tom Tarrer, who was then deceased, I think—it looked as if Mr. Norton ought to have it. He had done more for them than anybody else and but for him they probably would have lost the property."

With regard to Mabel Tarrer's physical and mental condition during the February 10, 1954 visit, the witness Purcell testified that she appeared to be perfectly sane, of good sound judgment, and in good health. He said that she was fully cognizant of what property she had and that she looked after it herself. Upon being asked if Mrs. Tarrer was under the influence of alcohol he answered: "Oh, no, she was perfectly sober."

During this first visit Mrs. Tarrer also mentioned that she wanted some arrangements made for her care and the conduct of her affairs in the event she became incapacitated. She was advised that these matters could best be taken care of by the establishment of a trust. She agreed to this and requested that Mr. Norton be named trustee in the instrument to be prepared. This trust agreement was discussed at each meeting with Mrs. Tarrer and was finally prepared and signed by the parties on March 25, 1954, one month after the will was executed. The trust arrangement is not in issue in this case.

Approximately one week after the first meeting, Mr. St. Clair and Mr. Purcell, having drafted the will, took it to

Mabel Tarrer at her home to determine if they had writ-
ten it exactly as she wanted it. On that occasion Mr. Nor-
ton was not with them. Mrs. Tarrer approved the draft
of the will, stating again her reasons for leaving her prop-
erty to Mr. Norton. Mr. Purcell again testified that on
their second visit Mabel Tarrer was in good condition,
physically and mentally, and "just as sober as she could
be."

One week thereafter, on February 25, 1954, these two
lawyers, having written the will in final form, presented
it to Mabel Tarrer for her examination and approval.
They read the will to her, or she read it, and she indicated
that it was exactly as she desired it to be. Mabel Tarrer
thereupon signed the will in the presence of Mr. St. Clair
and Mr. Purcell and they signed it as attesting witnesses
in her presence and in the presence of each other.

The following testimony was adduced in relation to the
physical and mental condition of Mabel Tarrer at the
time she executed the will: "Q. Now, at the time that
this instrument was signed by Mrs. Tarrer and by you
and by Mr. St. Clair as witnesses did you have occasion
to examine the mental and physical faculties of Mrs. Tar-
rer? A. Oh, yes. Yes. Q. And what was her mental and
physical condition at that time? A. She was fully pos-
sessed of her faculties. Perfectly sober and—you men-
tioned alcohol. Q. Was she under the influence of alco-
hol? A. None whatsoever. Not the slightest indication
of any of her senses that she had had a single drop of alco-
hol to drink. Q. And in your opinion— A. She was pos-
sessed of her faculties and knew what she was doing. Q.
In your opinion was she mentally capable of executing a
will at that time? A. Oh, yes. She knew exactly what
she was doing. Repeated a conversation about perhaps
revoking the will to the extent—or changing it, I
wouldn't say revoking it—by making a provision, testa-
mentary provision for this nephew. She might do this at
some future date. And we told her, as we had told her
before, that the will was revocable at any time by her, and
that she could change it and get any lawyer—I am not
sure—I said 'You could call us or any other lawyer you

want.' I know we told her that she could get any—any lawyer could do it for her."

Mr. Purcell readily admitted that he was not paid by Mrs. Tarrer or anyone else for this service but he nonetheless believed that he and Mr. St. Clair were rendering a service to her. Nothing in the record reveals that Mr. Norton had anything to do with the preparing, writing or execution of the will.

The plaintiffs contend that the writing herein referred to as a will was not, in fact, the true will and testament of Mabel Tarrer. The reasons assigned in support thereof are that she did not have the testamentary capacity to make a will on the date it was alleged to have been made and that she was subjected to undue influence.

Concerning Mabel Tarrer's testamentary capacity to make a will, only one witness, Clayborn Dillard, whose wife's mother will share in this estate in the event of an intestacy, testified as to her condition on February 25, 1954. Dillard testified, on direct examination, that Mrs. Tarrer drank intoxicating liquors in great quantities; that she drank more heavily in January and February, 1954; that he was in her house almost every day during that period and that on February 25, 1954, the date on which the will was alleged to have been executed, she was in such a drunken condition that she could not have transacted any business. This testimony, as to the exact date, was tendered from a notebook in which he says he kept a record of various events.

On cross-examination Dillard admitted that in his deposition taken on June 15, 1962, he was asked the following questions and gave the following answers: "Do you recall the occasion of February 25, 1954, can you remember that day specifically?" "No, sir, the date of February 25, 1954, I don't remember just—no sir, not that date exactly, no, sir." "Were you present in her [Mabel Tarrer] home on February 25, 1954?" "I don't recall if I was." "You have no way of identifying that date specifically?" "No, sir."

Dillard then testified on re-direct examination that he did not have his notes with him when his deposition was taken. Upon being questioned further by counsel for the plaintiffs, he said that he knew the events, about which he had formerly testified, had occurred but he did not know the date without his notebook.

Several other witnesses were produced on behalf of the plaintiffs who testified generally that Mabel Tarrer drank excessively, that they believed she was an alcoholic and that she was in no condition to conduct her business. No witness, however, other than Dillard, testified as to her condition on February 25, 1954. Furthermore, no witness, including Dillard, denied that Mabel Tarrer did conduct her business affairs from the death of her husband in 1952 until shortly before her death in 1961. A number of these witnesses also stated that Mrs. Tarrer had told them she had not made a will but that she intended to do so.

On the other hand, many witnesses, former neighbors and businessmen, testified on behalf of the defendant. These witnesses said that Mabel Tarrer was not an excessive drinker; most said that they had never seen her take a drink; and all agreed that she was capable of and did conduct her business affairs in a proper and effective manner.

At the conclusion of the testimony both parties made motions for a directed verdict, which motions were overruled. The jury returned a verdict that the paper probated in the County Court of Cabell County was not the last will and testament of Mabel Beatrice Tarrer. Judgment was entered on the verdict and on June 17, 1963, a writ of error and supersedeas to that judgment was awarded by this Court.

The first question to be resolved herein is that raised by the defendant's contention that the plaintiffs were barred from bringing this separate action for the purpose of testing the validity of the will. The defendant takes the position that when a will has been duly admitted to probate in solemn form by a county court, the only manner of testing its validity is by appeal to the circuit court

as provided in Code, 1931, 41-5-7. He further asserts that Code, 1931, 41-5-9, provides an absolute bar from maintaining such separate action.

Controlling in this matter are the provisions of Code, 1931, 41-5-12, the pertinent language of which reads as follows: "Notwithstanding the two preceding sections, * * * any person interested who, at the time, resided out of the State, or was proceeded against by publication, may, unless he actually appeared as a party or was personally summoned, file such bill within two years after the entry of such judgment or order."

A consideration of the history of these sections clearly shows that the two preceding sections referred to in the above quoted Code section mean Code, 1931, 41-5-9 and 11. In Barnes' West Virginia Code, 1923, these sections, in substantially the same language, immediately preceded the section now designated as Code, 1931, 41-5-12. The three sections were designated Chapter 77, Sections 31, 32 and 33. The one now known as Code, 1931, 41-5-10, was designated in Barnes' Code as Chapter 77, Section 26. When the 1931 Code was adopted, said Section 26 was inserted between the present sections 9 and 11, the language of Code, 1931, 41-5-12 (Barnes', Ch. 77, Sec. 33), remaining substantially unchanged.

Olga N. Frye is a nonresident of this state. She was served by publication but did not appear in the proceeding in the county court. She did institute this action within two years after the entry of the order of the County Court of Cabell County. We are of the opinion, therefore, that this action was properly instituted under Code, 1931, 41-5-12.

The additional errors assigned here give rise to two principal issues: (1) Did Mabel Tarrer, at the time she executed the will in question, possess the testamentary capacity necessary to make a valid will? (2) Was the will executed by Mabel Tarrer induced by undue influence on the part of the defendant?

Concerning one's mental or testamentary capacity to make a will, it is well settled that in a trial upon an issue

devisavit vel non the burden of proving testamentary capacity of the testator is upon the proponent of the will. *Floyd v. Floyd,* 148 W. Va. 183, 133 S. E. 2d 726; *Montgomery v. Montgomery,* 147 W. Va. 449, 128 S. E. 2d 480; *Ritz v. Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123; *Powell v. Sayres,* 134 W. Va. 653, 60 S. E. 2d 740; *Payne v. Payne,* 97 W. Va. 627, 125 S. E. 818; *Kerr v. Lunsford,* 31 W. Va. 659, 8 S. E. 493. The time to be considered in determining the capacity of the testator to make the will is the time at which the will was executed. *Floyd v. Floyd,* 148 W. Va. 183, 133 S. E. 2d 726; *Montgomery v. Montgomery,* 147 W. Va. 449, 128 S. E. 2d 480; *Ritz v. Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123; *Prichard v. Prichard,* 135 W. Va. 767, 65 S. E. 2d 65; *Moore v. Moore,* 120 W. Va. 468, 199 S. E. 257; *Pickens v. Wisman,* 106 W. Va. 183, 145 S. E. 177; *Payne v. Payne,* 97 W. Va. 627, 125 S. E. 818; *Stewart v. Lyons,* 54 W. Va. 665, 47 S. E. 442; *Kerr v. Lunsford,* 31 W. Va. 659, 8 S. E. 493.

For the purpose of considering Mabel Tarrer's testamentary capacity to make a will it is necessary to consider the evidence as a whole relating thereto. Many witnesses testified at the trial in relation to Mrs. Tarrer's condition over a period of years, but only Mr. Purcell, who appeared on behalf of the defendant, testified as to the actual execution of the will by Mabel Tarrer. He was the only witness to testify who was present at the time the will was executed. As heretofore noted, Mr. Purcell related at the trial that Mabel Tarrer, when she signed the will, was perfectly sober and was fully possessed of her faculties.

The only other witness who testified as to Mabel Tarrer's condition on that date was Clayborn Dillard. He related that Mrs. Tarrer was in such a drunken condition on February 25, 1954, that she could not have transacted any business. It is pertinent to note that he did not say she was in that condition when she signed the will. He does not claim to have been present at that time, nor does the record show that he was there when the will was signed.

As hereinbefore set out in more detail, the record shows that approximately one month prior to the trial Dillard, in a deposition, admitted that he did not remember anything about the happenings of February 25, 1954. He also stated that he had no way of determining what occurred on that date. Yet, one month later he appeared at the trial, produced a notebook which he claimed was his diary, and testified in detail as to events which occurred approximately eight years prior thereto.

So far as the competency of Mabel Tarrer is concerned, there was no attack upon her sanity. The claim of the plaintiffs was that she drank excessively and that by reason thereof she was incapable of making a will. Let us consider summarily the evidence in relation to the matter of excessive drinking. Clayborn Dillard, who testified that she drank heavily during 1953 and 1954, readily admitted that "I can't say she was drunk every day. I mean, I wasn't in her home every day." He acknowledged that she personally conducted her business affairs.

A witness for the plaintiffs, Pearl Hayes, testified that Mabel Tarrer drank excessively. On cross-examination, however, she readily admitted that Mrs. Tarrer's drinking occurred in "spells" and that she was always able to take care of her business. While other witnesses testified that Mabel Tarrer had a history of drinking intoxicating liquors, none said that she was unable to or did not personally conduct her business affairs. Furthermore, none of the plaintiffs' witnesses testified that he was present or knew of her condition when she signed the will in question.

On the other hand, several witnesses appeared on behalf of the defendant and testified that they knew Mrs. Tarrer during the time in question but had never seen her take a drink or become intoxicated. They, as did the plaintiffs' witnesses, testified that Mabel Tarrer was capable of taking care of her business affairs. Several persons with whom Mrs. Tarrer had engaged in business testified very affirmatively that she was a person of strong will and conducted her own business affairs over a period of many years, including the period involved here.

As noted above, the critical time to appraise the physical and mental capacity of a testator to make a will is the actual time of its execution. Concerning testamentary capacity, testimony relating to a testator's condition generally before and after the will is signed is of little or no probative value. The evidence of witnesses who were present at the execution of the will is entitled to peculiar weight, and this is especially so in relation to attesting witnesses. *Floyd* v. *Floyd,* 148 W. Va. 183, 133 S. E. 2d 726; *Stewart* v. *Lyons,* 54 W. Va. 665, 47 S. E. 442; *Kerr* v. *Lunsford,* 31 W. Va. 659, 8 S. E. 439; *Nicholas* v. *Kershner,* 20 W. Va. 251. while such evidence is not conclusive it must be clearly outweighed by other evidence. The question of testamentary capacity, like other questions of fact, must be decided by the preponderance of the evidence. *Smith* v. *Ottley,* 144 Va. 406, 132 S. E. 512.

What does the record disclose in the instant case relative to Mabel Tarrer's testamentary capacity to make a will? Not only do we have before us the clear and undisputed testimony of Mr. Purcell, related above, but it appears of record that Mr. St. Clair, a reputable attorney who assisted in preparing the will, was also an attesting witness. Certainly some weight must be given to this attestation, even though Mr. St. Clair was prevented by death from testifying at the trial. *Ritz* v. *Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123; *Forehand* v. *Sawyer,* 147 Va. 105, 136 S. E. 683. In addition to this, the record is replete with undisputed evidence that Mabel Tarrer was capable of and did in fact conduct her personal and business affairs from the date of her husband's death in 1952 until shortly before her death in 1961.

On the other hand, the only evidence offered by the plaintiffs to disprove Mabel Tarrer's testamentary capacity at the time the will was executed was that of Clayborn Dillard. This witness did not claim to have been present at the execution of the will, but testified from notes as to the occurrence of certain events on February 25, 1954. The other witnesses who appeared on behalf of the plaintiffs testified only in a general way as to

Mabel Tarrer's condition, but none knew of her demeanor on the day the will was executed.

It is pertinent to the determination of this case that there was in fact an executed will, proper on its face, which was admitted to probate. While there was some evidence alleging that Mrs. Tarrer's signature appeared to be different from her normal signature, there was no serious contention that it was not her signature. It is further pertinent that an attesting witness to the will testified that Mabel Tarrer possessed the necessary testamentary capacity to make a will at the time of its execution by her and that no other witness testified as to her condition at that particular time.

In view of the foregoing, we are firmly of the opinion that the proponent of the will, the defendant, has successfully borne the burden of proof in establishing the testamentary capacity of Mabel Tarrer. It has long been held by this Court that a verdict of a jury which is without sufficient evidence to support it, or is plainly against the decided weight and preponderance of conflicting evidence, should upon proper motion be set aside and a new trial awarded. *Floyd* v. *Floyd,* 148 W. Va. 183, 133 S. E. 2d 726; *Ritz* v. *Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123; *Powell* v. *Sayres,* 134 W. Va. 653, 60 S. E. 2d 740; *Coalmer* v. *Barrett,* 61 W. Va. 237, 56 S. E. 385.

We come now to the issue of undue influence. It is the contention of the plaintiffs that Mabel Tarrer executed her will as a result of undue influence exerted upon her by the defendant. There is no direct evidence in this case that any undue influence was exerted on Mabel Tarrer by the defendant or by anyone else. While undue influence may be proved by circumstantial evidence, such finding must be consistent with the exercise of undue influence and inconsistent with any theory other than undue influence. Proof thereof can not be based on mere suspicion, possibility or guess that such undue influence had been exercised. The burden of proof of such issue rests on the party alleging it. *Floyd* v. *Floyd,* 148 W. Va. 183, 133 S. E. 2d 726; *Ritz* v. *Kingdom,* 139 W. Va. 189, 79 S. E. 2d 123;

*Mullens* v. *Lilly*, 123 W. Va. 182, 13 S. E. 2d 634; *Ebert* v. *Ebert*, 120 W. Va. 722, 200 S. E. 831; *Payne* v. *Payne*, 97 W. Va. 627, 125 S. E. 818; *Kerr* v. *Lunsford*, 31 W. Va. 659, 8 S. E. 493; *Culpepper* v. *Robie*, 155 Va. 64, 154 S. E. 687.

The plaintiffs assert that Mabel Tarrer was unduly influenced to make her will by reason of the attorney-client relationship which existed between Mr. Norton and her. They reason therefrom that such relationship, and the fact that Mr. Norton would not have shared in her estate in the absence of a will, creates a presumption of fraud. This raises the question of the propriety of plaintiffs' Instruction No. 7, which was given by the trial court over the objection of the defendant. Therein the court instructed the jury that "while the burden of proving fraud and undue influence in a contested will case ordinarily rests upon the contestants, this is not the rule if an attorney who represents the testatrix writes or procures the writing and execution of the will and is a beneficiary of a substantial amount under the will, and would not share in the estate except for the will, in which event there is a presumption and suspicion of fraud and undue influence which the burden of overcoming is upon the proponent of the will." The court further instructed the jury that "if you * * * further find that the said Wilbert H. Norton procured an attorney or attorneys to write the said will and procure the execution of the same, then, there is a suspicion and presumption of fraud and undue influence * * *."

It is our view that this instruction is improper and that the giving thereof, over the objection of the defendant, constitutes reversible error. Our reason for this view is that such instruction is not supported by the evidence. There is absolutely no evidence in the record of this case from which it can be implied that the defendant had anything to do with the writing or execution of Mabel Tarrer's will. To the contrary, it affirmatively appears that Mr. Norton, the defendant herein, had no part whatever in the preparation of such will. This is not disputed in the record. Furthermore, it is undisputed that the

defendant had no connection whatever in obtaining the execution of the will in question.

The events which led to the drawing of this will have been discussed heretofore and it is not necessary to repeat them here. It is sufficient to note that Mr. Norton, upon being requested to write a will in which he was to be a beneficiary, proceeded with due caution and in full accord with the requirements of the ethics of his profession. There is nothing in the law which prohibits a client from leaving her property to her attorney if she so desires. It is difficult to see how this defendant could have acted in a more judicious manner.

The cases cited by the plaintiffs present circumstances where the beneficiary, holding a position of trust or confidence, was also the draftsman of the will; where the facts show that the testator was sick and feeble and readily susceptible to persuasion; and other factual situations which are not applicable to the facts as revealed by the record of the instant case. In proving undue influence the facts and circumstances of each case must be considered. *Culpepper* v. *Robie,* 155 Va. 64, 154 S. E. 687. Even if, as contended by the plaintiffs, the burden shifted to the defendant to prove the absence of fraud and undue influence, we are of the view that such burden was sucessfully borne. The record unquestionably shows that the defendant did not draft this will; that he was in no way concerned with its preparation or execution; that the testatrix had the capacity to make a will; and that she was fully and ably advised of all matters relating to the making of a will by independent counsel of unimpeachable character.

The contention of the plaintiffs that the will of Mabel Tarrer is invalid because it resulted in an unnatural disposition of her property is without merit. The testatrix had no children and in fact no close relatives, other than Olga N. Frye, a first cousin and a plaintiff herein. There is no requirement in the law that she leave her property to this plaintiff or to any other relative. As Mabel Tarrer's mental capacity to make a will at the time she exe-

cuted it is clearly established, she had the right freely to dispose of her property in any manner she desired, regardless of the opinions of other persons who may have believed such disposition was unequal, inequitable, unjust or unreasonable. *Ritz* v. *Kingdon,* 139 W. Va. 189, 79 S. E. 2d 123; *Ebert* v. *Ebert,* 120 W. Va. 722, 200 S. E. 831; *Stewart* v. *Lyons,* 54 W. Va. 665, 47 S. E. 442; *Coffman* v. *Hedrick,* 32 W. Va. 119, 9 S. E. 65; *Couch* v. *Eastham,* 29 W. Va. 784, 3 S. E. 23. See also *Forehand* v. *Sawyer,* 147 Va. 105, 136 S. E. 683, wherein the Court said: "When once the capacity of the testator has been established, his will must stand as the reason for his action. Be he wise or unwise, he is the disposer of his own property."

In view of our holding herein that Mabel Tarrer possessed the necessary testamentary capacity to make a valid will at the time such will was executed and that in doing so she was not subjected to undue influence by the defendant, the judgment of the Circuit Court of Cabell County is reversed, the verdict of the jury is set aside, a new trial is awarded the defendant, and this case is remanded to that court for such proceedings as may be necessary and proper and are not inconsistent with the principles enunciated in this opinion.

*Judgment reversed;*
*verdict set aside;*
*new trial awarded;*
*case remanded.*